UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

GLENDA BROADWAY *et al.*,

Plaintiffs,

v.

ST. JOSEPH REGIONAL MEDICAL
CENTER – SOUTH BEND CAMPUS, INC.
*d/b/a* MISHAWAKA MEDICAL CENTER,

Defendant.

CAUSE NO. 3:20-CV-421 DRL-MGG

OPINION AND ORDER

Within about a year, three Black women were terminated from their positions as switchboard operators at St. Joseph Regional Medical Center (SJRMC). Glenda Broadway, Kenya Mitchell, and Lisa Perry allege that their terminations resulted from unlawful discrimination and retaliation in violation of the Civil Rights Acts of 1866 and 1964. *See* 42 U.S.C. §§ 1981, 2000e-2(a)(1), 2000e-3(a). SJRMC requests summary judgment on all claims, which the court now grants.

BACKGROUND

In the 1990s, Lisa Perry, a hospital employee since 1988, began working as a switchboard operator. In 2010, Glenda Broadway began as needed at the switchboard and by 2019 worked as a full-time third-shift switchboard operator. In 2013, Kenya Mitchell began working as needed as a switchboard operator, eventually transitioning to part-time in 2016. The duties of a switchboard operator included taking and placing phone calls inside and outside the hospital and announcing emergencies and codes.

In January 2019, Sharon Eggleston became the manager of the switchboard department. She is not Black. She was an 18-year employee of the hospital. Ms. Eggleston's management style was stricter than her predecessor's style and included the formal implementation of guidelines and

enforcement of policies for the department, which were previously absent or unenforced. These policies related to time off, computer use, eating at desks, and breaks.

Ms. Eggleston evaluated the performance of the department's operators. She used three metrics: average answering speed, average handle time, and ring off/no answer (RONA). Reviews also evaluated the employee's adherence to the hospital's core values, essential functions, knowledge, and skills of the job. Employees could fully meet, partially meet, or not meet these metrics.

A.  *Discipline and Termination of Glenda Broadway.*

Ms. Broadway worked third shift. She was often the only switchboard operator working this shift, and she would receive approximately sixty calls per night. Like all switchboard operators, she underwent an annual review by Ms. Eggleston based on the department's three metrics.

Even before Ms. Eggleston's time, Ms. Broadway took issue with the metrics used in evaluations, claiming she was the only operator on the third shift and thus could not benefit from coworkers answering phones while she was otherwise unavailable. These concerns continued into Ms. Eggleston's tenure, and Ms. Broadway had a meeting with Ms. Eggleston and the hospital's community relations department about this issue.

At the end of August 2019, Ms. Broadway received her annual review that indicated she did not meet her performance expectations for her average handle time and RONA. Ms. Broadway attributed this to being the only operator on the third shift. Her annual review also indicated that she "occasionally" met expectations regarding compliance with the hospital's core values and "partially" met expectations for demonstrating "essential functions, knowledge and skills." Ms. Eggleston noted that there had been several instances when Ms. Broadway didn't communicate her concerns to Ms. Eggleston or the lead switchboard operator. Ms. Eggleston said Mr. Broadway should work on building trust with her colleagues and respect every person in the department.

On September 8, 2019, Ms. Broadway submitted a grievance to the hospital's human resource department about Ms. Eggleston's evaluation, which was denied. Finding no redress, Ms. Broadway filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC) on October 7, 2019.

On March 6, 2020, Ms. Broadway received a warning from Ms. Eggleston for posting comments on SJRMC's internal social networking tool, Yammer, which Ms. Eggleston and the human resource department viewed as inconsistent with the organization's code of conduct. The comments related to her frustration with the change in the structure of human resources and frustration about her compensation. This was Ms. Broadway's first disciplinary action. She filed suit on May 26, 2020.

On August 4, 2020, Ms. Broadway received a written warning for not providing a list of parishioners in the hospital to local clergy. She was placed on a performance improvement plan. Ms. Broadway says she successfully complied with the plan. Ms. Eggleston says Ms. Broadway's behavior did not align with the hospital's code of conduct, including folding her arms, not making eye contact, looking at the computer screen "pretending to be busy," and not engaging in conversation. When asked to be more engaged, Ms. Broadway responded that she could "do two things at one time." On one occasion, Ms. Broadway rested her head in her hand, appearing to be napping. Ms. Broadway was terminated on September 24, 2020.

B.  *Discipline and Termination of Kenya Mitchell.*

Ms. Mitchell worked part-time on first shift. She says Ms. Eggleston was a more difficult manager than her predecessor and "treated [Ms. Mitchell] like a second-class citizen." Even after Ms. Eggleston's departmental policy implementations, Ms. Mitchell asserts that Caucasian colleagues continued to eat at their stations and read magazines and newspapers without any consequences.

On September 17, 2019, Ms. Eggleston notified Ms. Mitchell that she could not bring her grandchild's fundraising candy bars to work because of the hospital's anti-solicitation and distribution

policy. This circumstance did not result in discipline. Ms. Mitchell viewed this communication as targeting her based on her race.

Early October that same year, Ms. Mitchell filed a charge with the EEOC. Around this same time, Ms. Mitchell received a gift card from a grateful patient. Ms. Eggleston informed Ms. Mitchell that she should not accept it and that she should use "common sense and good judgment." Ms. Mitchell interpreted this statement as saying she was stupid. Ms. Mitchell complained to Ms. Eggleston's supervisor (who is Black), noting that she found the response offensive.

On January 12, 2020, Ms. Mitchell received a written warning from Ms. Eggleston for taking ten extra minutes for lunch. Well after this incident, Ms. Mitchell informed the hospital that a Caucasian switchboard operator also took an extended break. The hospital told her they would look into it, but she doesn't know if it was investigated or discipline resulted. She believed her warning was discriminatory and retaliatory because of her support of her colleague (Ms. Perry) and Ms. Mitchell's EEOC charge. Ms. Mitchell filed a grievance. She met with Ms. Eggleston's supervisor and another representative, and they denied the grievance.

The next month, on February 28, 2020, Ms. Mitchell received a final written warning based on comments she made on Yammer. The substance of these comments included expressions of frustration with the hospital's restructuring of its human resource department. These were the only disciplinary actions Ms. Mitchell received during her tenure.

Ms. Mitchell filed suit on May 26, 2020. Four months later, on September 16, 2020, she was terminated due to overstaffing and budget constraints caused by the pandemic. The hospital looked to many factors to decide which positions to reduce, including corrective actions, and chose to terminate both Ms. Mitchell and a Caucasian colleague from the switchboard department. Ms. Mitchell believes that her position was eliminated in retaliation for filing an EEOC charge and this suit.

C.  *Discipline and Termination of Lisa Perry.*

On April 16, 2019, Ms. Perry was called into Ms. Eggleston's office and received a "corrective action" for smoking on hospital property. Ms. Perry occasionally walked to the end of the hospital's property to smoke, but she had never been disciplined by previous supervisors for doing so. Ms. Perry was not aware of anyone else being disciplined for smoking on hospital property and cannot say whether the discipline was based on race.

On May 9, 2019, Ms. Perry received another corrective action for being late numerous times over a twelve-month period. She took issue with the tardiness mark on May 4, 2019, in which she claimed she forgot to punch into work. She says the lead switchboard operator declined to fix the error despite correcting the same error for a Caucasian employee two months later. Ms. Perry believes this inaction was because of her race, though she isn't sure.

On July 10, 2019, Ms. Perry received another corrective action for three incidents. First, the hospital reprimanded her for going to the cafeteria after working for thirty minutes, despite being informed at a meeting by Ms. Eggleston that employees should not leave so soon after beginning work. After this incident, a cafeteria worker brought Ms. Perry breakfast once, for which Ms. Perry was also reprimanded. Finally, the corrective action claimed that she parked in the emergency room parking lot, which Ms. Perry says she hadn't done since 2018. Ms. Perry believes this corrective action was motivated by her race. She doesn't know if other employees were reprimanded too.

On December 2, 2019, Ms. Perry received a final written warning for working on a flyer for a private organization while at work. Ms. Perry believes she was singled out as many others in the department, regardless of race, also made personal copies at work, though she does not know if any other colleague was disciplined.

On December 6, 2019, Ms. Perry was suspended for allegedly threatening a coworker. The coworker claimed that Ms. Perry said to her, "like my momma always said, snitches get stiches," while

raising a fist. The coworker felt that the comment was directed at her because she had been monitoring where Ms. Perry parked. The hospital investigated the comment and concluded that the threat was substantiated and thereby warranted termination. Ms. Perry did not file a charge with the EEOC.

STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

A.    *Race Discrimination under Title VII and § 1981.*

Ms. Broadway, Ms. Mitchell, and Ms. Perry all allege that SJRMC discriminated against them based on their race. SJRMC argues that each one has not presented evidence of discrimination, including under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). In a collective response, the former switchboard operators eschew *McDonnell Douglas* and instead focus on the alleged

6

pretextual nature of their discipline and termination, while generally asserting it was not meted out to Caucasian employees.

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Similarly, § 1981 prohibits racial discrimination in employment, but does not otherwise require a party to file a complaint with the EEOC before bringing suit. *See Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459 (1975). These statutes provide independent avenues of relief for an aggrieved party. *Id.* at 461. Here, Ms. Broadway and Ms. Mitchell filed employment discrimination charges with the EEOC, but only Ms. Broadway brings both Title VII and § 1981 claims. Ms. Mitchell claims race discrimination under § 1981. Ms. Perry did not file a charge with the EEOC, so can only proceed under § 1981.

Whether a claim is brought under Title VII or § 1981, the court's analysis is similar. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403 (7th Cir. 2007). The plaintiff must "provide enough evidence to permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 411-12 (7th Cir. 2018) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)) (quotation omitted).

For a § 1981 action, the plaintiff must "ultimately prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). Under Title VII, the plaintiff must "show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013). Discrimination can be shown holistically or through the traditional burden-shifting framework of *McDonnell Douglas*, 411 U.S. at 802-05. *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021); *Ortiz*, 834 F.3d at 761, 765.

"[T]he well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Adv. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). "There is no magic to this test; it is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's race or other proscribed factor." *Id.*

Under this framework, a plaintiff must adduce evidence that (1) she is a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably. *Igasaki*, 988 F.3d at 957. If she meets each element of this *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual. *Id.* Only the burden of production shifts, never the burden of persuasion, which remains squarely on the employee's shoulders. *Comcast*, 140 S. Ct. at 1019.

Holistically, and without relying on *McDonnell Douglas*, a plaintiff may marshal evidence of intentional discrimination to overcome summary judgment. *Joll*, 953 F.3d at 929. Often "three broad types of circumstantial evidence [] will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Id.* (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). The evidence, taken together, must "permit a reasonable jury to infer 'an overall likelihood of discrimination' that merits a trial, not summary judgment." *Id.* (citing *Ortiz*, 834 F.3d at 763).

1.  *Glenda Broadway's Title VII and § 1981 Discrimination Claims.*

SJRMC argues that summary judgment must be granted on Ms. Broadway's Title VII and § 1981 discrimination claims because she lacks evidence that she was meeting the hospital's legitimate expectations at the time of the adverse employment action and that a similarly situated employee was treated more favorably than her. In response, Ms. Broadway broadly asserts she was meeting expectations and that Caucasian employees were treated more favorably, and says the reasons for her discipline and termination were pretextual.

The court begins with *McDonnell Douglas*—in particular, whether Ms. Broadway was meeting the hospital's legitimate expectations. Employee expectations are judged by "looking at [the employee's] job performance through the eyes of her supervisors at the time of [the adverse action]." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689-90 (7th Cir. 2008). Through this lens, the "question is not whether the ratings were *right* but whether the employer's description of its reasons [were] *honest.*" *Igasaki*, 988 F.3d at 958 (citation omitted) (disagreement with an evaluation "does not mean that the evaluations were the result of unlawful discrimination").

*McDonnell Douglas* focuses on the employee's performance at the time she experienced the adverse employment action. *Peele v. Country Mut. Ins. Co*, 288 F.3d 319, 329 (7th Cir. 2002) ("the issue is not the employee's past performance but whether the employee was performing well at the time of [her] termination" (quotation and citation omitted)). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007) (quotation and citations omitted). An adverse action must be a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Id.* (quotation and citation omitted); *see also Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016).

9

Ms. Broadway's significant change in employment status occurred when she was terminated. SJRMC implemented a performance improvement plan in August 2020. The plan identified three problems: (1) the failure to distribute the patient list to clergy, (2) lingering past her shift's end, and (3) "reckless and at-risk" behavior not aligned with the organization's guiding behaviors, policies, mission, or values. The plan instructed Ms. Broadway to address these problems, including when and how to email the clergy list, when to leave after work, and the expectation that she adhere to the hospital's code of conduct and other policies. In addition, Ms. Broadway was to improve her communication with her managers and not undermine their authority. The plan warned that improvement must occur immediately and be maintained; and, if any portion of the plan was violated, disciplinary action, including termination, could occur.

Ms. Broadway and Ms. Eggleston met weekly during the pendency of this plan. According to progress reports from these meetings, Ms. Broadway began meeting expectations as to the clergy list but declined under other performance criteria, including new call metrics, reading emails, and other errors. Ms. Eggleston believed Ms. Broadway's behavior during these meetings did not align with the hospital's code of conduct underscoring respect and collegiality. Ms. Eggleston reported that Ms. Broadway crossed her arms, rolled her eyes, made rude or condescending comments, and on one occasion appeared to be sleeping. Belying evidence of discriminatory pretext, Ms. Broadway does not contest that Ms. Eggleston honestly believed her behaviors during these meetings were inconsistent with the hospital's code of conduct. On September 24, 2020, Ms. Broadway was terminated because her behavior and conduct during the weekly performance improvement meetings "resulted in a break in trust and a violation of [the hospital's] Code of Conduct."

Ms. Broadway says she complied with the terms of her performance improvement plan for six weeks and her termination was pretext for race discrimination. "Strictly speaking, a plaintiff's own assertion that she met her employer's expectations *might* be sufficient to establish the second element

of her *prima facie* case," but the evidence as a whole must create a triable factual issue to survive summary judgment. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 574 (7th Cir. 2021) (citation omitted). The evidence doesn't do so here.

Ms. Broadway appears to base her conclusion of successful performance on the fact that she was successfully sending out the clergy list. But her performance improvement plan required more than just sending these emails. It also required adhering to the guiding principles and policies of the organization, which included fostering respect and trust, listening attentively, and acknowledging others with eye contact and polite behavior—all behaviors she acknowledged as important upon her hiring. But judging Ms. Broadway's conduct and performance through the eyes of her supervisor—the honesty of which Ms. Broadway does not contest with evidence—no reasonable jury could find that Ms. Broadway was meeting her employer's legitimate expectations at the time of the adverse action. *See Igasaki*, 988 F.3d at 958.

Furthermore, SJRMC argues that Ms. Broadway has not presented a similarly situated employee who was treated more favorably. To be similarly situated, an employee needs to be "directly comparable" in material respects, though not necessarily identical. *Johnson*, 892 F.3d at 895; *accord Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 575 (7th Cir. 2021) ("directly comparable to plaintiffs in all material respects" (quotation and citation omitted)). "[T]he similarly-situated inquiry is flexible, common-sense, and factual. It asks 'essentially, are there enough common features between the individuals to allow a meaningful comparison?'" *Smith v. City of Janesville*, 40 F.4th 816, 823 (7th Cir. 2022) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012)). Though flexible, the court generally looks to whether the plaintiff has identified a comparator who "(1) dealt with the same supervisor, (2) [was] subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 369 (7th Cir. 2019)

(quotation and citation omitted). "Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met [her] burden on this issue." *Id.*

Ms. Broadway has not presented any such comparator. Although Ms. Broadway argues generally that Caucasian switchboard operators were treated more favorably, she has not put forth any individual who was likewise subject to a performance improvement plan, who purportedly met at least some of the hospital's expectations, and who was nonetheless not discharged. Even taking one step back, she has not identified any individual who should have been placed on a performance improvement plan like her but wasn't.

In light of these two omissions, Ms. Broadway cannot establish a *prima facie* case for race discrimination under the *McDonnell Douglas* framework. *See Igasaki*, 988 F.3d at 958. Instead, Ms. Broadway asserts that a reasonable juror could conclude her discipline, placement on the plan, and subsequent termination were pretext for race discrimination. *See Joll,* 953 F.3d at 929. But even viewing this record holistically, Ms. Broadway's claims fare no better.

Ms. Broadway must "provide enough evidence to permit a reasonable factfinder to conclude that [her] race . . . caused the discharge or other adverse employment action." *Oliver*, 893 F.3d at 411-12 (quotation and citation omitted); *accord Comcast*, 140 S. Ct. at 1019 (§ 1981); *Nassar*, 570 U.S. at 343 (Title VII); *see also Arevalo-Carrasco v. Middleby Corp., Inc.*, 851 F. Appx. 628, 630-31 (7th Cir. 2021). Ms. Broadway argues that Ms. Eggleston singled her out and discriminated against her because of her race. The crux of her argument is that Ms. Eggleston held underlying racial animus resulting in her disciplining Ms. Broadway while not disciplining Caucasian switchboard operators.

To support this conclusion, Ms. Broadway says many Caucasian switchboard operators complained about her and the other plaintiffs, and Ms. Eggleston took only the complaints of Caucasian switchboard operators seriously. She also claims Ms. Eggleston "expressed discomfort"

with an article entitled "Dying of Whiteness" found in Ms. Mitchell's cubby. That said, she offers no actual evidence that certain complaints were favored over others. And as to the article, Ms. Eggleston testified that she was unaware of its existence until she brought Ms. Mitchell her personal belongings. Nothing reflects "discomfort" with the article. And nothing on this record fairly suggests for a reasonable jury that Ms. Eggleston or SJRMC harbored racial animus toward Ms. Broadway, or for that matter that her termination occurred because it was either motivated or caused by racial animus. There is no reasonable basis on this record for a jury to conclude that the hospital's reason for termination was pretextual or a lie.

Ms. Broadway also points to her work with the clergy list, the institution of a performance plan, and the warning she received for her Yammer posts. She argues that Ms. Eggleston disciplined Ms. Broadway based on her race. But Ms. Broadway admits she posted the comments on Yammer and that the performance improvement plan was concerned with more than just consistently sending out the clergy list. As to the interpersonal interactions during her performance improvement plan, Ms. Broadway does not contest the sincerity of Ms. Eggleston's negative and genuine reactions during their meetings. Bereft of disproportionate discipline among similarly situated comparators, discriminatory admissions or even suggestive comments or conduct, some evidence of dissembling, or other evidence, she offers nothing for a reasonable jury to conclude that she was disciplined based on her race. Her general assertion of racial animus and differential treatment is not moored in the record. *See Winsley v. Cook Cnty.*, 563 F.3d 598, 605 (7th Cir. 2009) ("bare assertions are not sufficient to establish a link between [the plaintiff's] race and her treatment"); *see, e.g., Joll*, 953 F.3d at 929.

Ms. Broadway has the burden to establish a triable issue. Merely alluding to the specter of discriminatory actions doesn't create a triable issue. *See Winsley*, 563 F.3d at 605; *see also United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010). The court isn't "a super personnel department that second-guesses [an employer's] business judgments," *Riley v. Elkhart Cmty. Sch.*, 829

F.3d 886, 895 (7th Cir. 2016) (citation omitted), not when they remain free of any of reasonable argument for unlawful animus. Ms. Broadway has not adduced evidence to permit a reasonable jury to conclude that an underlying impetus or the cause of her discipline or termination was racial discrimination, so the court must grant summary judgment on her respective Title VII and § 1981 discrimination claims.

### 2. *Kenya Mitchell's Title VII and § 1981 Discrimination Claims.*[1]

SJRMC argues summary judgment must be granted on Ms. Mitchell's claims because she has not marshaled evidence of a similarly situated employee who was treated more favorably and otherwise has not alleged an adverse employment action. In response, Ms. Mitchell argues that her discipline and termination were pretextual.

The court sees no reason to run the *McDonnell Douglas* analysis in detail. *See Igasaki*, 988 F.3d at 957. Ms. Mitchell never argues the analysis. Her briefing favors the holistic approach under *Ortiz*. In addition, the record permits no reasonable finding by a jury that she suffered an adverse employment action outside her eventual termination, or that a similarly situated employee outside her protected class was treated differently.

Ms. Mitchell may have been disciplined at times—a written warning for returning late from lunch and a final written warning for posting inappropriate comments about the SJRMC human resources department on Yammer—but "corrective action alone does not rise to the level of an adverse employment action." *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010). "There must be some tangible job consequence accompanying the reprimand to rise to the level of a material adverse employment action; otherwise every reprimand or attempt to counsel an employee could form the

---

[1] Ms. Mitchell pleaded only a § 1981 claim, but both SJRMC and Ms. Mitchell (at least seemingly at times) argue her discrimination claim also under Title VII. Accordingly, the court has considered her discrimination claim under both statutes.

basis of a federal suit." *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 731 (7th Cir. 2004); *accord Lewis*, 496 F.3d at 653 ("not everything that makes an employee unhappy is an actionable adverse action").

Ms. Mitchell experienced an adverse employment action only on September 16, 2020, when SJRMC says she was terminated due to overstaffing and budget constraints caused by the pandemic. She and a Caucasian switchboard operator were both terminated, and this decision was made based on many factors, including the corrective discipline. Thus, the court considers Ms. Mitchell's discipline history within the context of her termination in assessing her holistic story. *See Jones*, 613 F.3d at 671 (tangible connection).

Ms. Mitchell traces the beginnings of her discrimination to her written warning for returning from lunch late. On December 15, 2019, Ms. Mitchell emailed Ms. Eggleston and the lead switchboard operator asking to take a longer lunch break. She was denied permission because of hospital policy. Two colleagues reported that she took an extended lunch that day anyway. She contests whether she did, though she has not offered evidence indicating that the hospital's investigation into the issue and confirmation of the event were pretextual. She received a written warning. She says two Caucasian colleagues returned late from breaks on two occasions without apparent consequences, but she offers no evidence to draw their parallels as similarly situated and lacks any knowledge whether they too received discipline. She reported one employee for taking a longer break in the morning (not lunch), but did so about a month afterwards such that SJRMC could not readily investigate the event. SJRMC treated off-campus lunch breaks and on-campus short breaks differently for sound business reasons, so again one situation speaks little of the circumstances of Ms. Mitchell's discipline for the other situation. *See McDaniel*, 940 F.3d at 369 (quoting *Gates*, 513 F.3d at 690) (that a comparator "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]").

On February 28, 2020, Ms. Mitchell received a final written warning for posting comments critical of the SJRMC human resource department. The human resource department had been centralized in Livonia, Michigan. Several employees complained about the transition. Ms. Mitchell claimed the system was "frustrating" because it would run employees in circles, from the centralized office to local resources. SJRMC viewed the comments as inconsistent with its code of conduct. That said, she offers no evidence on this record that the written warning was based on her race or even that other employees made similar comments and received no discipline.

SJRMC addresses other issues in its briefing, but Ms. Mitchell focuses only on her discipline and her eventual termination.[2] SJRMC terminated her in September 2020. Ms. Mitchell has not presented evidence, even holistically, that would allow a rational jury to conclude her termination was caused by racial discrimination, much less motivated by race. *See Comcast*, 140 S. Ct. at 1019 (§ 1981); *Nassar*, 570 U.S. at 343 (Title VII). The hospital terminated both Ms. Mitchell and a Caucasian switchboard operator following a staffing reduction plan because of budget constraints from the pandemic and a drop in call-in volume—a decision across race that all but eliminates any reasonable inference of racial discrimination. She offers no evidence that the hospital's business decision to make these cuts was pretextual. *See Silverman v. Bd. of Educ.*, 637 F.3d 729, 743-44 (7th Cir. 2011) ("Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action.") (alteration and quotations omitted). The mere fact of termination, even evolving from the history of discipline on this record, offers nothing for a reasonable jury to view as race-motivated or race-driven. The court enters summary judgment accordingly. *See Winsley*, 563 F.3d at 605.

---

[2] For instance, Ms. Mitchell mentions that she saw Caucasian employees eating at the switchboard desk in violation of policy or reading periodicals, but she never received discipline for this conduct and offers no evidence that these other employees weren't disciplined. These facts prove immaterial to the analysis of discrimination and offer nothing probative for a reasonable jury.

3. *Lisa Perry's § 1981 Discrimination Claim.*

Ms. Perry did not file a charge with the EEOC, so she brings only a § 1981 claim. To succeed on her claim, she must present evidence that raises a genuine factual dispute that her termination would not have occurred but for her race. *See Comcast*, 140 S. Ct. at 1019; *Arevalo-Carrasco*, 851 F. Appx. at 630-31.

Ms. Perry worked at SJRMC since September 1988 and in the switchboard department since the mid-1990s. She was terminated for allegedly threatening a coworker. Rather than argue through the *McDonnell Douglas* framework, she jumps to pretext and seems to argue her case holistically, doing so based on three prior disciplinary actions and her termination.

On May 9, 2019, Ms. Perry received a written warning for receiving five attendance demerits in a rolling twelve-month period. She concedes the accuracy of these attendance incidents, though she asked for one to be corrected because it slipped her mind to punch into work. This warning neither qualifies as an adverse employment action, *see Jones*, 613 F.3d at 671; *Lucas*, 367 F.3d at 731, nor reveals to a reasonable jury any causative racial animus when Ms. Perry can identify no similarly situated colleague who had the same demerits and received no discipline, or who just missed punching into work but received no discipline. She says a Caucasian coworker was once allowed to amend her time record, but Ms. Perry offers no specifics to compare or draw conclusions and leaves the record silent as to whether this other coworker was likewise disciplined. Ms. Perry thus offers nothing holistically on the record to view this written warning as indicative of racial animus—merely her unsubstantiated speculation. *See Winsley*, 563 F.3d at 605 (conjecture cannot create a triable issue).

On July 10, 2019, Ms. Perry received a written warning for taking a meal break thirty minutes after her shift began, eating a meal in the switchboard office while taking calls, and parking in non-employee locations. Taking a meal break so early had not been frowned upon by her predecessor supervisor, but Ms. Eggleston had directed the department to cease this activity. Eating at the

switchboard was also disapproved unless an employee was working a shift when there wasn't other coverage. Ms. Perry offers only her speculation that this discipline reflected racial animus. She never reported any others who may have done the same thing and offers no instance in which Ms. Eggleston witnessed other employees violating these rules but let it go undisciplined.

No racially based or suggestive comments accompanied Ms. Perry's discipline. She challenges in her declaration whether she really violated the hospital's policies but offers no evidence that would show this warning to be pretextual or that Ms. Eggleston applied her understanding (or misunderstanding) of the policy differently among different races. That security chose not to enforce a prohibition of hospital employees parking in spots dedicated to emergency room patients didn't foreclose Ms. Eggleston from addressing this issue with her direct reports, nor would her decision to do so reflect racial animus to a reasonable jury. This corrective action wasn't an adverse employment action. *See Jones*, 613 F.3d at 671; *Lucas*, 367 F.3d at 731. Nor on this record does it permit even a reasonable inference of race discrimination. *See Winsley*, 563 F.3d at 605.

On December 3, 2019, Ms. Perry received a final written warning for doing personal work with company resources or on company time, namely cutting, taping, and working on social club flyers. She says other colleagues—including Black and Caucasian colleagues—made personal copies at work. She offers no evidence that others in similar situations weren't also disciplined. She merely offers her belief that she was being singled out because of her race, but no evidence of that—no evidence of race-based statements, suggestive conduct, inconsistent treatment of Black and Caucasian switchboard operators, inconsistent policy enforcement, differing discipline, or anything else that might reveal racial animus. She declined to report other employees so that Ms. Eggleston could address any one coworker's alleged misbehavior. Instead, she generally says she believes that both Caucasian and Black colleagues were treated differently than her, but she offers no evidence of it. Even then, if

all employees across all races were treated this way, save for Ms. Perry, at most the decision was unfair to her, but not racially based.

To that point, Ms. Eggleston testified that she learned that other employees had used Facebook, bought items on Amazon, and played games online, and even received permission from human resources to investigate whether the use of the four switchboard consoles in this way could be correlated to a particular employee, but the investigation came up emptyhanded. Thus, rather than show discriminatory enforcement, the undisputed facts reveal that Ms. Eggleston took reasonable steps to halt personal use of hospital property across the board. Ms. Perry has not demonstrated on this record that the hospital (through Ms. Eggleston) disciplined her pretextually or discriminatorily.

On November 8, 2019, another switchboard operator reported that Ms. Perry approached her (approximately a month prior), complained that someone in the department was snitching, held up her fist, and said, "like my momma always said, snitches get stiches." The coworker felt the comment was directed at her because she had been tattling on Ms. Perry's parking activity. The hospital investigated the comment, concluded that the threatening conduct was substantiated, and decided that this incident independently warranted termination. Accordingly, Ms. Perry was terminated.

Ms. Perry argues this termination was unreasonable on its face, as the expression "snitches get stiches" is a common expression in pop culture and not an actual threat. The consequence of this argument is that, but for Ms. Perry's race, the hospital would not have taken this threat seriously. The "issue is not whether [the plaintiff] was a menace; it's whether [s]he appeared to be." *Merheb v. Ill. St. Toll Highway Auth.*, 267 F.3d 710, 713 (7th Cir. 2001). "Only if the other employees' frightened reactions to the words or conduct of a fellow employee were completely unreasonable would the employer be obligated to disregard them." *Id.* at 714; *accord Coleman*, 667 F.3d at 852 ("must [] identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the response "that a reasonable person could find [it] unworthy of credence"). The expression was reasonably construed

19

by the hospital as serious and threatening, and nothing on this record demonstrates that the hospital had to construe Ms. Perry's actions as joking or innocent, or that it was mere pretextual to act as the hospital did. At no time has Ms. Perry offered a comparator who made such a comment but was treated differently. The hospital investigated this incident, found this threat to be credible, and accordingly terminated her. A reasonable jury could not find this action to have been racially driven.

Ms. Perry never complained to management or human resources about racial discrimination while she worked at SJRMC. She never heard anyone at SJRMC make any racial slurs about her or her Black colleagues. She never heard Ms. Eggleston make any comments about her race. The court has been presented only with general claims of other switchboard operators, all supervised by Ms. Eggleston and subject to the same policies, who may or may not have received discipline following certain conduct, none of which has been comparatively aligned to what the hospital reasonably believed Ms. Perry did. A comparator who may have engaged in behavior without being caught, or whose discipline status remains unknown, does not allow for any reasonable inference of discriminatory treatment. *See McDaniel*, 940 F.3d at 369. In the end, Ms. Perry cannot satisfy the *McDonnell Douglas* analysis, even if she tried, nor will the holistic story she advances permit a reasonable jury to find that racial animus caused her termination after a series of corrective warnings. The court grants summary judgment.

4. *Race Discrimination Claims Holistically.*

Ms. Broadway, Ms. Mitchell, and Ms. Perry urge the court to consider their discipline and termination collectively, citing *Troupe*, 20 F.3d at 737. Even viewing this argument as consistent with the holistic approach that allows the court to consider all evidence together "to understand the pattern it reveals," *Ortiz*, 834 F.3d at 764-65, not one of these plaintiffs offers evidence that an action vis-à-vis one elucidates the actions vis-à-vis another, or makes a holistic telling of their stories sufficient to permit a reasonable jury to find for any one or all of them. The three argue collectively that they were

all terminated within ten months of each other after a new supervisor was hired, but they offer no evidence to show this was race-motivated or race-driven, *see Comcast*, 140 S. Ct. at 1019; *Nassar*, 570 U.S. at 343, rather than just the product of a new supervisor who was intent on enforcing policies that historically had not been. Each one was terminated for a legitimate reason on this record—Ms. Broadway for not meeting her performance improvement plan, Ms. Mitchell (and a Caucasian colleague) because of pandemic-caused budget constraints, and Ms. Perry because of an investigated and reasonably believed threat. No reasonable jury could find that any one of these decisions was pretextual.

At summary judgment, it is the court's task to "focus on the most persuasive story possible on the non-movant's behalf when asking whether a verdict in her favor would be reasonable or could result only from irrational speculation." *Joll*, 953 F.3d at 928. But it is also the moment "when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir. 2003) (quotation omitted). These three employees had the burden to ground their claims of racial animus in the record so as to allow a reasonable juror to conclude that race was a motivating factor (for Title VII), or indeed a but-for cause (for § 1981), in their adverse employment events. The evidence presented by Ms. Broadway, Ms. Mitchell, and Ms. Perry does not allow a reasonable juror to reach this conclusion.

   B.   *Ms. Broadway and Ms. Mitchell's Retaliation Claims.*

Ms. Broadway and Ms. Mitchell bring retaliation claims against SJRMC. They allege that the discipline they received, and their eventual terminations, were in retaliation for their EEOC charges and this lawsuit. SJRMC argues that Ms. Broadway and Ms. Perry have not presented evidence to support a retaliation claim. Ms. Perry does not bring this claim.

"Title VII's antiretaliation provision forbids employer actions that discriminate against an employee . . . because [s]he has opposed a practice that Title VII forbids or has made a charge, testified,

assisted, or participated in a Title VII investigation, proceeding, or hearing." *Burlington N. & Santa Fe Ry. Co. v. Caucasian*, 548 U.S. 53, 59 (2006) (quotations omitted). "The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Id.* at 67. To succeed on such a claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotations omitted). A plaintiff may also sue under § 1981. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008).

In a retaliation claim, a plaintiff may proceed under either the direct or indirect methods of proof. *See Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018); *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). Although this circuit has abandoned the distinction between "direct" and "indirect" evidence in discrimination claims, *see Ortiz*, 834 F.3d at 763-64, this should not be confused with the separate methods that still apply in the retaliation context, *see Swyear*, 911 F.3d at 885. The court focuses on the overriding central inquiry: "could a reasonable trier of fact infer retaliation[?]" *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015); *accord Ortiz*, 834 F.3d at 765-66.

Neither Ms. Broadway nor Ms. Mitchell utilize the indirect method in argument. They rely on the direct method and must show that (1) they engaged in a protected activity; (2) suffered a material adverse employment action; and (3) there was a causal connection between the protected activity and adverse employment action. *Swyear*, 911 F.3d at 885; *see also Burlington*, 548 U.S. at 57. "A causal link requires more than the mere fact that an employer's action happens after an employee's protected activity." *Boss*, 816 F.3d at 918. They must show that but for the protected act, they would not have been terminated. *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014) (quoting *Reynolds v. Tangherlini*, 737 F.3d 1093, 1104 (7th Cir. 2013)) ("[R]etaliation claims under Title VII require traditional but-for causation, not a lesser 'motivating factor' standard of causation.").

The only material adverse action was their termination. To demonstrate a causative link between their protected activity of filing an EEOC charge or this suit and their termination, both Ms. Broadway and Ms. Mitchell offer evidence of the timing of these events and speculation about pretextual discipline. Their speculative belief about pretextual discipline isn't grounded in evidence, so that leaves timing. The lawsuit was filed about four months before their termination, but just because the rooster crows doesn't mean he caused the sun to rise that same morning, much less four months later. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966-67 (7th Cir. 2012) (holding five week lapse too long to base a retaliation claim solely on suspicious timing because "[f]or an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action"); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven-week interval too long to raise inference of retaliation); *Filipovic v. K & R Express Sys.*, 176 F.3d 390, 398-99 (7th Cir. 1999) (four months between protected activity and termination was "counter-evidence of any causal connection"). Without something more, this timing alone is insufficient to permit a reasonable jury to find that any protected activity was causatively linked to their termination. The court grants summary judgment.

C.   *Remaining Claims.*

SJRMC argues that summary judgment should be granted on various other allegations. The employees don't respond to these remaining claims—for instance, a failure to promote claim by Ms. Broadway; discriminatory denial of medical leave by Ms. Mitchell; and hostile work environment claims. *See, e.g., Paschall v. Tube Processing Corp.*, 28 F.4th 805, 812-14 (7th Cir. 2022) (hostile environment); *McDonnell Douglas*, 411 U.S. at 802 (discrimination); *Riley*, 829 F.3d at 891 (failure to promote). These claims have been abandoned. *See Jackson v. Litscher*, 742 F. Appx. 146, 147 (7th Cir. 2018). The court grants summary judgment on these abandoned claims.

23

CONCLUSION

Based on this record, no reasonable jury could conclude that these three women lost their jobs because of their race or because they engaged in protected activity. Construing all facts and reasonable inferences in favor of Glenda Broadway, Kenya Mitchell, and Lisa Perry, the court GRANTS summary judgment for SJRMC [ECF 36, 38, 40]. The court likewise GRANTS the unopposed motion to unseal documents [ECF 50] and directs the clerk to unseal the record evidence [ECF 48]. This order terminates the case.

SO ORDERED.

September 30, 2022                          _s/ Damon R. Leichty_____
                                           Judge, United States District Court